IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| **CYNTHIA MCKAUGHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:06cv0056** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Cynthia McKaughan filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final determination by the Commissioner of Social Security ("Defendant" or "Commissioner") that Plaintiff is not disabled and denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under Title II and Title XVI of the Social Security Act ("the Act"), as amended. Currently pending is Plaintiff's Motion for Reversal or Remand of the Commissioner's Decision (Doc. No. 14), filed along with a supporting Memorandum (Doc. No. 15). Defendant has filed a Response, arguing that the decision of the Commissioner is supported by substantial evidence and should be affirmed (Doc. No. 20). Plaintiff has filed a Reply. (Doc. No. 23.)

For the reasons stated below, Plaintiff's Motion will be granted and this matter remanded to the Commissioner for further fact-finding.

## I. INTRODUCTION

Plaintiff filed her applications for DIB and SSI on June 30, 2003, alleging that she has been disabled since December 15, 2000 due to back pain, shoulder pain, arm pain, neck pain, depression, and anxiety. (Doc. No. 11 (Administrative Record ("AR")), at 49–51, 439–41.) Plaintiff's applications were denied both initially and upon reconsideration. (AR 25–26, 27–28, 29–31, 35–36.) Plaintiff subsequently requested and received a hearing. (AR 37, 20–23.) Plaintiff's hearing was conducted on January 9,

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

2006, by Administrative Law Judge ("ALJ") Robert C. Haynes. (AR 452.) Plaintiff, her daughter Teri Barnes, and vocational expert ("VE") Jane Brenton appeared and testified. (AR 452–53.)

On March 6, 2006, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. (AR 9–19.) Plaintiff filed a timely request for review of the hearing decision. (AR 8.) On June 16, 2006, the Appeals Council issued a letter declining to review the case (AR 5–7), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). This Court must affirm if it finds that the Commissioner's decision is supported by substantial evidence in the record and that the Commissioner did not commit any legal errors in the process of reaching that decision. *Id.*; *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

**II.    REVIEW OF THE RECORD**

Plaintiff alleges disability due to constant extreme back pain, shoulder pain, arm pain, neck pain, depression, and anxiety. A review of both her physical and psychiatric course of treatment follows.

**A.    Medical Evidence – Physical Health**

The earliest treatment note in the record is dated April 11, 1997, from the North Terrace Medical Clinic ("NTMC"), where Plaintiff was a patient through at least July 2005. (AR 123–32, 184–216, 235–51.) In the first couple of years of treatment, she was diagnosed with anxiety and prescribed BuSpar (AR 132), then Valium (AR 130) and Xanax (127); bursitis of her right shoulder for which she was given injections of Kenalog and Xylocaine (AR 128, 129, 130); and headaches, for which she was prescribed Fioricet (AR 127). She began complaining of pain in her neck as well as her shoulders and elbows in October 1999, and was referred for nerve conduction tests. (AR 126.)

X-rays of her left elbow, left shoulder, cervical spine and lateral chest conducted at Crockett Hospital on October 7, 1999 were unremarkable. (AR 166–69.) However, an MRI of Plaintiff's lumbar spine conducted on November 17, 1999 indicated spondylosis, posterior protrusion and disc bulge at L5–S1 but no significant spinal stenosis. (AR 164.)

On January 5, 2000, Plaintiff had a consultation with neurologist Dr. Paul R. McCombs. According to a letter from Dr. McCombs to nurse practitioner Pat Burks at NTMC on that date, Dr.

McCombs had diagnosed "significant cervical spondylosis with cord encroachment at C5-6 and C6-7." [2] (AR 217.) Dr. McCombs further noted that he discussed the possibility of surgery with Plaintiff and that Plaintiff was going to think over the matter and contact him when she was ready to proceed. (AR 217.) Plaintiff returned to NTMC on January 11, 2000 to discuss surgery with her primary care practitioner. Her diagnosis that day was neck pain and bulging cervical disc. (AR 125.)

On February 22, 2000, Plaintiff returned to NTMC complained of GI upset and a history of ulcers. She was diagnosed with peptic ulcer disease ("PUD") and acid reflux, and prescribed Tagamet. (AR 124.) In November 2000, she was diagnosed with gastrointestinal reflux disease ("GERD"), chronic obstructive pulmonary disease ("COPD"), osteoarthritis, and some other condition which is not legible. She was diagnosed Vioxx, Valium, Lortab and "hormones," and referred to both an ENT and a cardiologist. (AR 123.)

Plaintiff returned to NTMC on May 1, 2001 complaining about her nerves and that Valium was not working. (AR 216.) [3] On August 14, 2001, she continued to complain about neck and low back pain. (AR 215.) She was referred for an MRI of her cervical spine at Crockett Hospital the following day. That study showed a left paracentral disc protrusion with slight impression on the thecal sac and mild bilateral neural foraminal stenosis, but no cord compression, at C5-6. The MRI also revealed a small central disc protrusion at C6-7. (AR 158–59.) After reviewing these results on September 20, 2001, Ms. Burks at NTMC referred her to Dr. Sunil Jain at the Integrative Medicine and Pain Center. (AR 214.)

Plaintiff saw Dr. Jain on September 26, 2001. (AR 133–34.) According to his letter of that day to Ms. Burks, Plaintiff reported chronic neck and back pain. She stated she had experienced back pain off

---

[2] The test results of whatever study permitted Dr. McCombs to reach that diagnosis are not in the record.

[3] The treatment records from this time frame do not indicate their source nor identify the medical professional from whom Plaintiff obtained treatment. The Table of Contents for the Administrative Record identifies these records as Dr. McCombs', but they are not accompanied by a DDS records request to verify that assumption. They actually appear to be from Pat Burks ("PB," whose initials appear at the bottom of most of these treatment notes) at the NTMC. A letter from Dr. Jain dated September 26, 2001 is addressed to Pat Burks at the NTMC on Buffalo Road in Lawrenceburg, Tennessee. (AR 133.) Dr. McCombs' letter to Pat Burks is simply addressed to P.O. Box 8005 in Lawrenceburg. (AR 217.) The records that are demonstrably from NTMC indicate an address of P.O. Box 8005, and Plaintiff's Disability Statement identifies Pat Burks as her "overall health care provider" at NTMC, address 609 N. Buffalo Rd. in Lawrenceburg. The Court therefore presumes that NTMC simply changed the forms used in Patient Charts during this time frame and that Dr. McCombs' and NTMC's records are interspersed indicates either that Dr. McCombs requested NTMC's records at some point, or NTMC obtained Dr. McCombs'.

and on "all her life," but that the neck pain started in 1991.  She also had a lot of anxiety and nerve problems.  She rated the severity of her back pain at 5 on a scale of 0-10 and the neck pain at 3 out of 10 but radiating into both arms.  She reported that bending, sitting for long periods, lifting, etc. increased the pain but pain medications make it better.  She also claimed to have headaches, with photosensitivity, approximately once a week lasting 2-3 days each, which she associated with stress.  She also had insomnia, which she attributed to pain and anxiety.  (AR 133.)  On examination, Dr. Jain determined Plaintiff's strength to be at 4+/5 "throughout" (presumably meaning upper and lower extremities), with normal tone and reflexes and no sensory deficit in a dermatomal pattern.  (AR 134.)  He found diffuse tenderness of the upper trapezius muscles bilaterally.  Dr. Jain had reviewed the August 2001 MRI as well as Dr. McCombs' note from January 2000, and he also noted that Plaintiff listed her current medications as including Valium, Premarin, Robaxin, and Darvocet.  (AR 133.)  Dr. Jain referred Plaintiff back to Ms. Burks for ongoing care, but recommended that she try physical therapy, a TENS unit, and application of moist heat.  He also noted she might benefit from antidepressants rather than Valium for her nerves as well as for treatment of chronic pain, and that a psychiatric consult might be indicated.  (AR 134.)

Also on September 26, 2001, Plaintiff underwent another MRI of the lumbar spine (AR 157), the results of which were not significantly different from those of the study conducted on November 17, 1999 (AR 164).  Dr. McCombs reviewed the MRI and, according to a note in the file to Ms. Burks dated October 1, 2001, interpreted it as indicating degenerative disc disease at L5-S1 but did not recommend surgery.  (AR 213.)  At Plaintiff's next visit to NTMC on October 29, 2001, Ms. Burks noted a diagnosis of degenerative disc disease ("DDD") of the lumbar spine accompanied by low back pain, and she referred Plaintiff to physical therapy.  (AR 212.)

At follow-up examinations on December 27, 2001, February 29, April 29, and May 20, 2002, Plaintiff complained of knee pain (AR 211) and right foot and ankle pain (AR 210, 209), while Ms. Burks also indicated continuing diagnoses of DDD, COPD, and anxiety.  X-rays of Plaintiff's right foot and ankle conducted on May 10, 2002 were normal (AR 156) as was an MRI conducted on May 28, 2002 (AR 155.)

At follow-up visits on June 3 and 27, 2002, Plaintiff continued to complain of right ankle pain and also indicated she was anxious about her boyfriend (who apparently was diagnosed with cirrhosis).  (AR

208, 207.)  On October 9, 2002, Plaintiff complained about pain in her right shoulder and elbow.  She was diagnosed with bursitis and received injections at both joints.  A diagnosis of COPD was again noted. (AR 206.)

Her treatment record for January 7, 2003 indicates Plaintiff complained of continued pain in her neck and numbness in her arms and legs.  Another MRI was ordered and she was referred to Dr. McCombs for surgery.  Ms. Burks noted that Plaintiff had been advised to have surgery on her cervical spine two years previously.  (AR 205.)  Plaintiff underwent an MRI on January 24, 2003, which revealed disc space narrowing at C5-6 and C6-7, and prominent posterior bulges at these levels with minimal osteophyte formation.  The radiologist's impression was of "[s]pondylitic ridging" at C5-6 and C6-7 with and left foraminal narrowing at C5-6.  (AR 154.)  Plaintiff underwent surgery performed by Dr. McCombs at Centennial Medical Center on April 1, 2003.  The discs at C5-6 and C6-7 were excised and Plaintiff's cervical spine was fused at those levels with anterior plates and blocks.  She was noted to tolerate the procedure well.  (AR 136–41.)

She had a post-operative follow-up appointment with Dr. McCombs on July 16, 2003, at which time he noted her condition to be "stable" but recommended referral to a chronic pain management center for continued treatment of her pain.  (AR 200.)  Plaintiff complained to Ms. Burks on July 29, 2003 of chronic neck pain and was referred to a pain management clinic.  (AR 199.)

Plaintiff apparently began treatment at the Spectrum Pain Clinic some months later, on October 14, 2003.  On that date, Plaintiff filled out a "Pain Inventory" on which she characterized the pain she experienced as moderately severe, consistent, and ranging from dull to pounding and stabbing, and occasionally accompanied by numbness, "pins and needles," tingling and stiffness.  She rated her average pain level at a 6 on a scale of 0 to 10 and listed Lortab as her current pain medication.  She also indicated that looking up, repetitive movements, sleeping, stopping and turning her head left or right aggravated her condition, while Advil and pain medications relieved it.  (AR 178.)  Objective findings that day included decreased range of motion in the cervical spine, inflamed right elbow, tenderness of the cervical and lumbar spine with pain on extension and flexion/rotation, positive results on the right side for Fabere's Test, Lateral Illiac Compression Test, Gaenslen's Sign and Impingement Sign, and radiculopathy of the right upper extremity.  Plaintiff received 8 trigger point injections and indicated she

was not interested in physical therapy.  (AR 179, 196.)  She was prescribed Lortab, Neurontin, Xylocaine gel, and Zanaflex.  (AR 196.)

Plaintiff had follow-up treatments at the Spectrum Pain Clinic every three to four weeks from October 31, 2003 through at least July 14, 2005  (AR 264–327.)  At basically all of these visits, Plaintiff consistently reported neck and low back pain as well as right arm pain and numbness.  Beginning around October 2004, Plaintiff's treatment notes at Spectrum document depression.  (AR 294.)  Plaintiff's medication list at different times included Atarax, Baclofen, Bextra, Clarinex, Lortab, Effexor, Elavil, Lexapro, Lidoderm, Neurontin, Nexium, Norflex, Percocet, Potassium, Pravachol, Prevacid, Strattera, Topamax, Vytorin, Xanax, Xylocaine, Zanaflex, and Zelnorm.  In addition to pain medications, her chronic pain management consisted of regular trigger point and tendon origin injections.  She also received injections at the right sacroiliac joint in December 2003 (AR 321), May 2004 (AR 308–09), and September 2004 (AR 297–98) by Dr. James W. Ladson at the Spectrum Pain Clinic.  On July 2, 2004, Dr. Ladson performed a right cervical median branch nerve block injections at C5-6, C6-7 and C7-T1.  (AR 303–05.)  On January 14, 2005, Dr. Jianping Sun at Spectrum performed bilateral lumbar medial branch nerve blocks at L3, L4 and L5.  A month later, Dr. Sun performed bilateral RF rhizotomy of medial branch nerves at L3 and L4.  (AR 282.)  Dr. Sun performed Epidural Steroid Injections at T1-T2 on April 15, 2005 (AR 275) and at C6-C7 on June 16, 2005.  (AR 268.)  The treatment notes accompanying many of these procedures indicate Plaintiff had chronic moderate to severe pain that was unresponsive to conservative measures.

Meanwhile, Plaintiff continued to have regular appointments at the North Terrace Medical Clinic through July 2005.  (AR 235–51.)  At these, she continued to report neck and back pain as well as anxiety, insomnia, COPD and other ailments.  In June 2004, Ms. Burks noted that Plaintiff "cries easily" and was "very depressed."  (AR 247.)  In October 2004 she noted "much stress" and "can't sleep."  (AR 243.)  On July 7, 2005, Ms. Burks noted that Plaintiff cried excessively and talked of suicidal ideation.  (AR 236.)

B.    Medical Records – Mental Health

Plaintiff called Centerstone Community Mental Health Center ("Centerstone") to set up her first appointment on July 9, 2004.  At that time she noted that she had bad nerves and anxiety problems, and

got "depressed during the summer months for no apparent reason." The initial assessment was that she was experiencing anxiety and having "marked difficulty dealing with current life stressors." (AR 434.) On July 15, 2004, Plaintiff first visited and met with David Knight, M.A., who performed an intake assessment. (AR 429–35.) Plaintiff's mental status exam revealed an appropriate appearance and mood/affect, restless behavior, normal thought processes, poor insight, and fair judgment. (AR 435.) Plaintiff stated that she desired treatment and would be compliant with future sessions. (AR 434.)

On July 29, 2004, Plaintiff met with Mr. Knight and reported functioning well despite minimal depression and periodic problems with increased anxiety. (AR 427.) Mr. Knight noted that Plaintiff verbalized her stressors and was willing to determine coping strategies to help alleviate her depression. (AR 428.) In August 2004, Mr. Knight noted Plaintiff was "[p]erforming ADL's OK. Some problems with energy level." She was also having memory problems and had recently been tested for Huntington's Disease (of which she had a family history). (AR 425.) Plaintiff continued to have regular individual therapy sessions at Centerstone basically every two to four weeks through at least November 2005, with a gap in the month of October 2005. (AR 358–72, 387–424.) She met with Mr. Knight through April 2005 and then with Laurie Tollefson, LCSW, MSSW, beginning May 2005 through November 2005.

The therapists' notes for the duration of Plaintiff's treatment tend to show that Plaintiff had increasing anxiety and depression as a result of a progressively worsening living situation. A Clinically Related Group ("CRG") assessment for Plaintiff dated November 16, 2004 indicated moderate limitations in performing activities of daily living, interpersonal functioning, and concentration, task performance, and pace; marked limitations in adaptation to change; placed Plaintiff within Consumer Group 1 as a person with severe and persistent mental illness; and estimated her current GAF at 55. (AR 354–56.)

In December 2004, she stated she had been feeling increased pressure and anxiety as a result of her boyfriend's illness and possibility of imminent death. She was afraid that if he died she would face eviction and a total lack of income, as the couple lived on the boyfriend's disability payments. She also lacked transportation because her car needed repair. (AR 415–16.) In March 2005, Mr. Knight noted that Plaintiff's ability to take care of activities of daily living was "[p]oor due to pain." (AR 404.) In April he noted that Plaintiff was drowsy from pain medications but "coherent enough to understand" the

seriousness of her problems with her boyfriend, as she had reported that he had physically attacked her after an argument.  (AR 399.)

A CRG assessment dated April 28, 2005 (AR 351–53) was basically identical to the assessment in November 2004.  It likewise indicated moderate limitations in activities of daily living, interpersonal functioning, and concentration, task performance, and pace, and marked limitations in adaptation to change, characterized Plaintiff as a person with severe and persistent mental illness, and estimated her current GAF to be 55.  (AR 351–53.)

On June 14, 2005, Plaintiff reported to Ms. Tollefson that she had been experiencing crying spells related to conflict with her adult daughters and also acknowledged "fleeting thoughts of suicide" but no plan.  Ms. Tollefson had her sign a "safety contract" and verbally affirm that she would stay with friends or talk with her boyfriend when stressed.  (AR 395.)  On June 28, Plaintiff continued to report sadness, crying spells, low energy and low self-esteem.  She stated that when she was 19 she had tried to cut her own wrist.  (AR 392.)  In July Plaintiff presented with a dysthymic mood and increased irritability and anger.  She had received a letter notifying her she would be discontinued from TennCare.  (AR 389–90.)  In early August 2005 she reported that she lacked energy but "force[d] herself to perform adls."  She also was experiencing increased anxiety, insomnia, racing thoughts and poor appetite since having informed that her TennCare insurance was being terminated.  (AR 387–88.)

A different therapist at Cornerstone, Rosemary E. Scott, MSN, performed a Psychiatric Evaluation on Plaintiff on August 31, 2005.  (AR 374–85.)  On that date, Ms. Scott reported that Plaintiff had lost her TennCare coverage and been off all of her medications except Xanax, of which she still had some left.  Being off her pain medications caused increased anxiety and exacerbated her depression.  She reported increased pain, insomnia, crying spells, and social paranoia.  (AR 375.)  Ms. Scott also performed a mental status exam, which resulted in a diagnosis of generalized anxiety disorder, major depressive disorder, recurrent and severe without psychotic features, and a current GAF of 50.  Ms. Scott restarted Plaintiff on Lexapro and Straterra and helped her enroll in a prescription assistance program ("PAP"), after which Plaintiff showed some improvement.  (AR 383, 373.)

A CRG assessments dated September 27, 2005 (AR 348–50) is basically identical to the first two except it indicated Plaintiff's current GAF to be at 48, and noted that the highest GAF within the last six months was 55 and the lowest 42. (AR 349.)

In November 2005, Plaintiff reported that her status was basically the same except she had left her boyfriend and found her own apartment, about which she expressed pride in herself. (AR 358–59.)

**C.  Agency Consultant Examinations, Medical Records Reviews and Medical Source Statements**

*(1)  RFC Completed by Consultant Dr. James Moore, September 2003*

On September 10, 2003, Tennessee Disability Determination Services ("DDS") consultant Dr. James N. Moore completed a Physical Residual Functional Capacity ("RFC") Assessment regarding Plaintiff's physical abilities based upon a review of Plaintiff's medical records. (AR 170–75.) On that date, Dr. Moore noted that Plaintiff had undergone a cervical diskectomy at C5-6 with anterior cervical plating and C5-6 and C6-7 on April 1, 2003, less than six months previously. He acknowledged that Plaintiff reported continued pain, but he presumed that "with the proper therapy, the [claimant] should be able to return to moderate work by 04/01/04. Pain is creditable [sic] for the current time frame, but is not able to be projected in that proper therapy should minimize pain to non-severe levels." (AR 172.) Consequently, his RFC assessment was not "further reduced due to pain." (*Id.*) On the basis of that rationale, Dr. Moore opined that by April 1, 2004 (seven months into the future) Plaintiff would be capable of occasionally lifting and/or carry 50 pounds; frequently lifting and/or carrying 25 pounds; standing and/or walking about 6 hours in an 8-hour workday; sitting for about 6 hours in an 8-hour workday; and that she would have an unlimited ability to push and pull. (AR 171.) He did not believe that she would be subject to any postural, manipulative, communicative or visual limitations (AR 172–73), but did find that she would need to avoid concentrated exposure to vibrations because of the hardware in her spine (AR 174).

*(2)  Medical Assessment to Do Work-Related Activities Completed by Treating Specialist Dr. Paul McCombs, February 2004*

In the Medical Assessment to Do Work-Related Activities form completed by Dr. McCombs on February 29, 2004 (AR 180–83), Dr. McCombs acknowledged that he had last seen Plaintiff on July 16, 2003. However, he was of the opinion that Plaintiff was capable of lifting up to ten pounds occasionally but incapable of frequent lifting. (AR 180.) He did not believe that Plaintiff's ability to stand, walk or sit

was impaired and specified that she should be able to walk six to eight hours in an eight-hour work day, and two hours without interruption.  (AR 180, 182.)  He also opined that she should avoid heights and moving machinery, only occasionally balance, stoop, crouch, and kneel, and never climb or crawl.  (AR 181–82.)  Dr. McCombs reported that Plaintiff was limited to frequent bending and occasional reaching, including working with hands overhead.  (AR 183.)  Dr. McCombs did not cite to any specific medical findings to support his assessment, so the Court can only presume his opinions are based on his having performed surgery on the Plaintiff and assessed her condition both prior to and after surgery.

> ### (3)    *Dr. Suresh Acharya's "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)," July 2005*[4]

Dr. Suresh R. Acharya is a physician who supervised the nurse practitioners, including Pat Burks, working at NTMC, where Plaintiff had been a patient for at least eight years.  Dr. Acharya provided a "Medical Opinion" regarding Plaintiff's abilities dated July 7, 2005 in which he indicated that Plaintiff could occasionally lift and carry twenty pounds; frequently lift or carry less than ten pounds; stand and walk about three hours during an eight-hour day; and sit about three hours in an eight-hour day.  (AR 231.)  Dr. Acharya further opined that Plaintiff could sit for twenty minutes and stand for ten minutes before having to change positions, and must walk around every thirty minutes for ten minutes at a time.  (AR 232–32.)  Dr. Acharya noted that Plaintiff needed the opportunity to shift at will between sitting and standing or walking, and that she would "rarely" need to lie down at unpredictable intervals during a work shift.  (AR 232.)  Dr. Acharya assessed Plaintiff as capable of occasionally twisting, stooping and climbing stairs but never crouching or climbing ladders.  (AR 232.)  He cited medical findings in support of the limitations he ascribed, including degenerative disc disease of the lumbar and cervical spine with foraminal narrowing in the cervical spine, and a history of cervical diskectomy with fusion and cervical plating.  (AR 232.)  He also noted that spinal stenosis caused numbness and tingling in the upper extremities and that Plaintiff's strength was decreased as a result of her prior surgery.   On that basis, Dr. Acharya believed that reaching ability (including overhead),  fine manipulation, feeling, and pushing/pulling were affected.  (AR 233.)  He also stated that she should avoid concentrated exposure to humidity; even moderate exposure

---

[4] Unfortunately, the Spectrum Pain Clinic did not complete a Medical Source Statement, although requested to do so by the Defendant.  An administrator from Spectrum returned the form with a note on it stating:  "Our Doctors <u>do not</u> fill out medical source statements.  We ask that their primary care physicians fill these out."  (AR 257 (emphasis in original).)

to extreme temperatures, wetness, and noise; and all exposure to fumes, odors, gases, poor ventilation, and hazards, such as machinery and heights because these environmental factors could cause acute exacerbation of her emphysema. (AR 233.) Finally, Dr. Acharya noted that Plaintiff suffered from severe depression, had suicidal ideations, and would likely be absent from work more than three times in a month as a result of her impairments. (AR 233–34.)

> ### (4) Consulting Examination and Medical Source Statement from Dr. Darrel Rinehart, September 2005

On September 6, 2005, at the request of the DDS, Plaintiff met with Dr. Darrel R. Rinehart at Columbia Regional Medical Center and for a consulting examination. (AR 328–30.) Dr. Rinehart noted that Plaintiff complained of back pain as a result of degenerative disc disease and bulging discs, along with chronic neck pain, that she had had surgery on her neck in 2003, and that she had a history of chronic obstructive pulmonary disease. (AR 328–29.) Physical examination was basically normal although Dr. Rinehart noted some shortness of breath.[5] Spinal x-rays conducted the day of the examination showed no skeletal abnormalities of the lumbar spine, and post-operative changes but no other marked abnormalities of the cervical spine. (AR 335.) Dr. Rinehart believed Plaintiff should be able to sit, stand, lift and walk six to eight hours in an eight-hour workday without limitations, and that she had no postural, manipulative, visual, communicative or environmental limitations. (AR 330; *see also* AR 331–34 (Medical Source Statement of Ability to Do Work-Related Activities).)

> ### (5) Psychological Evaluation by Dr. Deborah Doineau, September 2005

Licensed Psychologist Dr. Deborah Doineau performed a psychological examination and evaluation of Plaintiff, at the request of the DDS, on September 22, 2005. She complied her findings in a narrative summary (AR 336–44) and also filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental) (AR 345–47). Dr. Doineau diagnosed Plaintiff with depressive disorder not otherwise specified with possible transient psychotic features, panic disorder without agoraphobia, and possible somatization tendencies. She found Plaintiff exhibited histrionic personality disorder traits, noted that Plaintiff experienced multiple stressors including lack of money or permanent lodgings, and assessed

---

[5] Dr. Rinehart noted that Plaintiff underwent pulmonary function testing as part of his examination and that the results were enclosed with his report. The test results do not appear to be in the Administrative Record, however.

Plaintiff's current GAF to be 65. She did not find any evidence of malingering. (AR 342.) She believed Plaintiff had mild to moderate impairment in her ability to concentrate persistently, mild impairment of memory, persistence and pace hampered by her physical condition. (AR 431–42.) According to her Medical Source Statement of Ability to Do Work-Related Activities, Dr. Doineau also found that Plaintiff experienced a slight impairment in her ability to understand, remember, and carry out detailed instructions (AR 345), and moderate impairment in her ability to respond appropriately to work pressures in a usual work setting (AR 346).

### D. The Hearing before the ALJ

#### (1) Plaintiff's Testimony

At the hearing held on January 9, 2006 before the ALJ, Plaintiff confirmed that she was born on July 27, 1959, and has a high school education. (AR 455.) Plaintiff reported that she lives with her boyfriend, who is also disabled and draws a pension check of $603.00 a month, which is the couple's only source of income. (AR 457–58.)

Plaintiff testified that she grocery shops, but that her daughter carries her groceries in for her. (AR 456–57.) Plaintiff testified that her daughter lives about 6 miles away and is at Plaintiff's house every day to assist Plaintiff in household chores when she gets off of work at 2:00 p.m. (AR 457–58.) Plaintiff also testified, however, that both she and her boyfriend can cook for themselves. (AR 456.) Plaintiff further testified that she can "stand there to do the dishes because it doesn't take but about five or ten minutes." She also testified she was capable of putting clothes in the washing machine and folding them herself. (AR 462.)

Plaintiff testified that she quit working in 2003, at Dr. McCombs' instruction, as a result of her back and neck pain. (AR 456.) Plaintiff reported that the last job she performed was "logging" at Denny Rodgers Logging, during which she worked on a shift, taking breaks every two hours. Plaintiff also reported working at Murray Ohio lifting heavy parts, during which she also took breaks every two hours. (AR 458–59.)

Before her job with Murray Ohio, Plaintiff testified that she did housework for a woman, but then stated that her back and arms kept getting worse, forcing her to quit. (AR 462.) Plaintiff stated that she did this work for two years but then "got to the point [where she] couldn't do any of that anymore." (AR

462–63.)  Plaintiff also testified to doing saw mill work which involved "stack[ing] sticks" that were two inches by two inches and four feet long.  Plaintiff testified that this position at the saw mill only last about six months.  (AR 463.)

Plaintiff reported that on a typical day, she will "get up in the morning and [ ] get dressed" and then spend most of the day sitting in a chair or lying on the couch watching television.  (AR 459.)  Plaintiff stated that she will get up and walk around the house often because she cannot tolerate sitting for very long at a time.  Plaintiff testified that she cannot tolerate walking for very long periods of time either, reporting that she cannot "walk a block without it hurting."  (AR 459–60.)

Plaintiff testified that she has seen both Dr. McCombs and Pat Burks for her health problems, but that Burks is her primary care physician, whom she now continues to see on a regular basis.  (AR 460–61.)  Plaintiff testified that for her mental health problems, she has been going to Centerstone Community Mental Health Center for almost two years.  (AR 475.)

Plaintiff testified that "there is no part of [her] that would allow [her] to do anything."  (AR 464.)  Plaintiff reported that the bursitis in her arm prevents her from doing repetitive motion, and she cannot lift anything above her head or raise her arms above her head.  Plaintiff further stated: "I can't lift anything, I can't sit, I can't stand for very long and there's no job that's like that."  (AR 464.)

### *(2)* *Testimony of Teri Barnes*

Plaintiff's daughter, Teri Barnes, also appeared and testified at the hearing.  (AR 464–68.)  Ms. Barnes testified that she lives near Plaintiff and sees her every day.  (AR 465.)  Ms. Barnes testified that she works four hours a day, and then goes to Plaintiff's house to "help her with stuff that she needs help with."  (AR 469.)  Ms. Barnes testified that when she goes to Plaintiff's house, Plaintiff is usually watching television and doing "normal stuff."  (AR 469.)

Ms. Barnes reported that Plaintiff lives with her boyfriend, who is disabled and cannot do anything around the house.  Ms. Barnes testified, therefore, that Plaintiff has to do everything that is done around the house unless Ms. Barnes helps Plaintiff with it.  (AR 468.)

Ms. Barnes testified that most of the time, she goes shopping with Plaintiff and helps her lift things.  (AR 465.)  Ms. Barnes testified that Plaintiff tries to do things "the best she can," but she is not able to do much because "her back is messed up."  (AR 466.)  Ms. Barnes stated that she will pick up

Plaintiff's milk, Pepsi, sugar, and other things that Plaintiff knows she cannot pick up without pain.  (AR 468.)

Ms. Barnes testified that when Plaintiff tries to do things, "she has to sit down" because "she can't do it."  (AR 466.)  Ms. Barnes further stated that she believes Plaintiff's condition is "getting worse" because Plaintiff used to be able to "pick up her grand kids and hold them for long extended periods of time." (AR 467.)  Ms. Barnes stated that Plaintiff can no longer do this.  Ms. Barnes stated that "the kids cry to get up in her lap . . . for her to hold them [but] she cannot do it."  (AR 467.)

### (3)     Testimony of Vocational Expert Jane Brenton

Vocational expert ("VE") Jane Brenton also testified at Plaintiff's hearing.  (AR 469–78.)  The VE to classified Plaintiff's past relevant work as follows: Certified Nursing Assistant ("CNA"), medium and semi-skilled; lumbar stacker, medium and unskilled; and clipper, light and unskilled.  The VE noted that Plaintiff has occupied various manual labor positions for Murray Ohio, which she characterized as medium and unskilled.  (AR 469.)

The ALJ asked the VE to consider a hypothetical situation involving a claimant who, like Plaintiff, is a younger person with a high school education, with the functional abilities ascribed by DDS consultant Dr. James N. Moore, including the ability to lift 50 pounds occasionally and 25 pounds frequently; to stand and/or walk and to sit for about six hours each out of an eight-hour work day, and the need to avoid concentrated exposure to vibrations because of the hardware in her spine.  (AR 469–70.)  The VE answered that a person with the limitations described by Dr. Moore could perform "primarily medium level work," with the added environmental restriction on vibrations.  She opined that an individual with those limitations could perform the Plaintiff's past jobs of CNA and a lumber stacker, but could not say whether the prior labor jobs involved concentrated exposure to vibrations.  (AR 470.)

The ALJ then asked the VE to consider a hypothetical situation involving a claimant with the abilities and limitations described by Dr. McCombs in his Medical Assessment to Do Work-Related Activities.  Dr. McCombs found Plaintiff was limited to lifting ten pounds occasionally and not able to do any frequent lifting; she could bend frequently but should do no climbing or crawling, only occasional balancing, stooping, crouching and crawling, and avoid exposure to heights and moving machinery.  Dr. McCombs also opined that Plaintiff could stand and/or walk for six to eight hours in an eight-hour

workday, and for two hours uninterrupted, and could bend frequently, reach occasionally, and should avoid working with her hands overhead. (AR 470–71.) According to the VE, the limitations described by Dr. McCombs would limit the hypothetical claimant to sedentary work and would rule out all of Plaintiff's past relevant work. (AR 471.)

The ALJ also asked the VE to consider the limitations described by Dr. Acharya at NTMC. The VE agreed that Dr. Acharya's limitations would bar any kind of full time work. (AR 471.) A hypothetical claimant with the abilities described by Dr. Rinehart in his Medical Source Statement, however, would have no functional limitations at all. (AR 471.) The ALJ observed that the various treating and examining physicians covered "a rather significant range of limitations." (AR 471.)

The ALJ then asked whether there were any jobs at the sedentary level that a person with the restrictions described by Dr. McCombs in Exhibit 7F could perform. The VE responded that an individual with those restrictions would be able to perform the job duties required of a general office clerk, of which there are approximately 50,000 jobs in Tennessee; order checker, of which there are approximately 1200 in Tennessee; and inspector, of which there are approximately 7,000 jobs in Tennessee. The VE further verified that all of these jobs were sedentary, unskilled, entry-level positions. (AR 472.) The ALJ did not inquire as to whether the VE's testimony was consistent with the D.O.T.'s classification of these same jobs.

The ALJ asked the VE to factor into consideration Dr. Doineau's psychological evaluation, which indicates slight limitations in understanding, remembering, and carrying out detailed instructions, and a moderate limitation in responding appropriately to work pressures in a usual work setting. The VE responded that such limitations would have no effect on the hypothetical claimant's ability to perform the jobs she had already identified. (AR 472.)

Finally, the ALJ asked whether a person with pain that "essentially precludes activity except for the most minimal exertional activity" and that lasts "essentially most of a work day" would be able to work. The VE stated that an individual with that level of pain would not be able to perform any work. (AR 472.)

## III.    THE ALJ'S DECISION

In his written Decision, the ALJ made the following specific findings of fact:

1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).

3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease, a depressive disorder, and a generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Based upon careful consideration of the entire record, it is concluded the claimant has the residual functional capacity to occasionally lift 10 pounds, stand or walk 6 to 8 hours in an 8-hour workday, unrestricted sitting in an 8-hour workday, with the postural limitations of occasional balancing, stooping, kneeling, and crouching, no climbing or crawling, with frequent bending, occasional reaching, and no fine acuity, with the mental impairments of moderate impairment in ability to concentrate consistently and respond appropriately to work pressures.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 27, 1959 and was 41 years old on the alleged disability onset date, which is defined as a younger individual age 18–44 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of jobs skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from December 15, 2000 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 14–19.)

## IV. LEGAL ANALYSIS

### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to

support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (citations omitted).

**B.      Proceedings at the Administrative Level**

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" includes previous work performed by the claimant, as well as any other relevant work that exists in the national economy in significant numbers, regardless of whether such work exists in the immediate area in which the lives, whether a specific job vacancy exists, or whether the claimant would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g.*, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the claimant, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the claimant must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Heston*, 245 F.3d at 534 (citing *Abbott*, 905 F.2d at 923; 20 C.F.R. §§ 404.1520(b) and 416.920(b)). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)(2000)). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled. *Heston*, 245 F3d at 534.

Once the claimant establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts at step five to the Commissioner to show that the claimant can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g.*, *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. 20 C.F.R. §§ 404.1520, 416.920. In cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner may rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining a claimant's residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. § 423(d)(2)(B).

C.        **Plaintiff's Statement Of Errors**

Plaintiff contends that the ALJ committed the following errors in reviewing her claim:

(1) that at Step Five of the sequential analysis the ALJ failed to comply with the requirements of Social Security Ruling 00-4p and that, consequently, the Commissioner failed to meet his burden of demonstrating the existence of jobs in the economy that Plaintiff can perform despite her impairments;

(2) that the ALJ erred in adopting the lesser psychiatric restrictions imposed by a one-time consultative examiner (Dr. Doineau) over the opinion of Plaintiff's treating mental health practitioners; and

(3) that the ALJ erred in failing to consider all of the evidence and all of Plaintiff's impairments in combination.

(*See* Doc. No. 15, at 5.)  Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or remanded as a result of these purported errors.

As set forth below, the Court finds that the ALJ did not err in adopting Dr. Doineau's opinion and that he appropriately considered all the evidence in the record.  However, remand is required because the ALJ failed to resolve apparent conflicts between the D.O.T. and the VE's testimony regarding jobs in the economy that Plaintiff could perform, as discussed in greater detail below.

### (1)     The ALJ Properly Weighed the Evidence

Plaintiff maintains that the ALJ erred in relying on Dr. Doineau's opinion regarding Plaintiff's mental impairments and subsequently rejecting the records from Centerstone Community Mental Health Center.  Plaintiff also maintains that the ALJ erred in rejecting the opinion of Dr. Acharya and relying instead on the opinion of Dr. McCombs in determining Plaintiff's RFC.

With regard to the evaluation of medical evidence, the applicable Social Security Regulations require the Commissioner to *consider* every medical opinion in the record, regardless of its source.  20 C.F.R. §§ 404.1527(d), 416.927(d).  The opinion of a "treating source"[6] "on the issue(s) of the nature and severity of [the claimant's] impairment(s)" must be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the ALJ rejects the opinion of a treating source, he is required to articulate good reasons for doing so.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

---

[6] The term "treating source" is defined as a claimant's "own physician, psychologist, or other acceptable medical source," and who has provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [her]."  20 C.F.R. §§ 404.1502, 416.902.

Further, in the event the ALJ does not accord controlling weight to a treating source's opinion, he must determine what weight to give it and each of the other medical opinions in the record by evaluating them in light a number of factors including the examining and treatment relationship, the evidence provided in support of the medical source's opinion, the consistency of the opinion with other evidence in the record, and whether the opinion is from a specialist in the area in which he offers an opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Plaintiff's therapists at Centerstone Community Mental Health Center, David Knight and Laurie Tollefson, treated Plaintiff for an extensive period of time, a fact that might justify the ALJ's giving greater weight to their opinions than to other opinions. As the ALJ noted, however, the conclusions reported by Centerstone contradict other substantial evidence in the record.

Specifically, as the ALJ observed, on November 16, 2004 and April 28, 2005 Centerstone assessed Plaintiff's GAF as 55 and assessed Plaintiff as having moderate impairments in activities of daily living, interpersonal functioning, concentration, performance and pace; and a marked impairment in adaptation to change. (AR 17–18.) On September 22, 2005, Dr. Doineau examined Plaintiff and, on the basis of her examination, reported that Plaintiff had a moderate impairment in her ability to concentrate consistently and respond appropriately to work pressures, along with a current GAF of 65. (AR 18.) The ALJ then pointed out that the low GAF scores reported by Centerstone were not supported by the therapists' treatment notes in the record, which described Plaintiff as generally functioning pretty well despite her stressors, and he therefore considered Dr. Doineau's assessment to be the most persuasive.

Ordinarily, the opinion of a consulting physician is not entitled to the deference due the opinion of a treating source. *Barker v. Shalala*, 40 F. 3d 789, 794 (6th Cir. 1994). However, as the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 416.927(d)(2), 404.1527(d)(2). Instead, when there is contradictory evidence, the treating source's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinion of a treating source is inconsistent with each other substantial evidence in the record, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). The

Regulations further state that the more objective evidence cited in support of a medical opinion, the more weight will be given that opinion. 20 C.F.R. § 416.927(d)(3).

Moreover, the Commissioner's decision in this case became final prior to the issuance of Social Security Ruling 06-03p, which clarifies how the Commissioner is to consider opinions and other evidence from sources who, like Mr. Knight and Ms. Tollefson, are not among those medical sources defined by the Regulations as "acceptable medical sources." SSR 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006); see 20 C.F.R. §§ 404.1513, 416.913 (defining the term "acceptable medical source" as including licensed physicians, psychologists, podiatrists, optometrists, and speech pathologists, and "other sources" as including all other medical sources not listed as "acceptable medical sources," including, for example, therapists as well as nurse practitioners, physicians' assistants, chiropractors, and so forth). The Sixth Circuit has specifically held with respect to SSR 06-03p that it is not binding retroactively. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541–42 (6th Cir. 2007). Thus, prior to August 9, 2006, an ALJ had the discretion to completely disregard, without providing good reason, the opinions of "other medical sources" such as Mr. Knight and Ms. Tollefson. The ALJ's decision in this case was rendered prior to August 9, 2006.

Based on all these considerations, the ALJ's decision to accord greater weight to Dr. Doineau's assessment is consistent with the applicable legal standard and supported by substantial evidence in the record.

Likewise, the ALJ also articulated good reasons for assigning greater weight to Dr. McCombs' opinion than to Dr. Acharya's opinion. The ALJ noted that Dr. Acharya's assessment is not fully supported by other evidence in the record, namely Plaintiff's subjective complaints and her own statements regarding her daily activities. The ALJ adequately considered all the evidence in the record and reasonably concluded that Dr. Acharya's assessment was inconsistent with other substantial evidence in the record. Moreover, both Dr. Acharya and Dr. McCombs were or are treating physicians, and Dr. McCombs, unlike Dr. Acharya, is a specialist in the area in which he offers his opinion. Under the circumstances, the ALJ was not required to assign controlling weight to Dr. Acharya's evaluation. He applied the appropriate legal standard, and his decision regarding Plaintiff's RFC is supported by substantial evidence in the record.

### (2)    The Effect of Social Security Ruling 00-4p

As explained above, the Commissioner has the burden at step five of the sequential evaluation of establishing the existence of a significant number of jobs in the national economy that the claimant can perform given her age, experience, education, and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920.   Here, Plaintiff argues that, based on their Dictionary of Occupational Titles ("D.O.T.") descriptions, the jobs relied on by the ALJ to deny benefits are not compatible with Plaintiff's residual functional capacity as determined by the ALJ.

In a hypothetical presented to the VE, the ALJ referenced Dr. McCombs' assessment of Plaintiff's physical capabilities and asked the VE to assume a hypothetical claimant who was limited to sedentary work with only occasional reaching.  (AR 15, 470–71.)  The VE testified that there were approximately 58,000 total jobs in Tennessee that a person with those limitations could perform, including those of general office clerk, order checker, and inspector.  The VE specifically testified that the jobs she identified were sedentary and unskilled, entry-level jobs.  (AR 471–72.)  In his written opinion, the ALJ adopted Dr. McCombs' assessment and found that Plaintiff was not disabled based upon the VE's testimony that there were jobs in the national economy that an individual with those specific limitations could perform.

Plaintiff points out that the VE in this case did not provide specific D.O.T. numbers and used "rather broad job titles" to describe the jobs she believed the Plaintiff could perform.  With respect to the "general office clerk" jobs identified by the VE, Plaintiff argues that the D.O.T. does not reference a job with that precise title, though it does contain a listing for "general clerk," alternatively known as "routine office clerk."  D.O.T. 209.562-101.  This position is classified by the D.O.T. as Light Work, with "[p]hysical demand requirements in excess of those for Sedentary Work," and it is described as requiring reaching on a "frequent" basis as well as frequent use of "near acuity."  *Id.*  The D.O.T.'s description of this job is clearly inconsistent with the VE's.  If the ALJ had relied on the D.O.T.'s description, based on his determination that Plaintiff was capable of sedentary work with only occasional reaching and "no fine acuity" (AR 15), he would have been forced to conclude that the requirements of this job are in excess of the ALJ Plaintiff's abilities.

The VE also testified that Plaintiff could perform the job of "order checker."  As Plaintiff points out, "order checker" is the alternate title for three different jobs identified in the D.O.T.:  invoice-control clerk,

shipping clerk, and receiving clerk. Of these, only the job of invoice-control clerk (or "purchase-order checker") (D.O.T. 214.362-026) is classified as sedentary work,[7] but it, like the job of general office clerk, requires "frequent reaching" and frequent use of "near acuity." *Id.* The requirements of the jobs of order checker, as characterized by the D.O.T., are therefore also inconsistent with the job requirements as identified by the VE and, based on the D.O.T. alone, would appear to exceed Plaintiff's capabilities as determined by the ALJ.

The job of "inspector" is another very broad term representing "a vast array of occupations, at all exertional and skill levels." (Doc. No. 15, at 7.) Notwithstanding, according to Plaintiff and based upon this Court's own research, the D.O.T. lists only three "inspector" positions that are classified as sedentary work at the unskilled level: dowel inspector (D.O.T. 669.687-014), film touch-up inspector (D.O.T. 726.684-050), and cigarette-making-machine catcher (D.O.T. 529.666-014). All of these jobs require frequent or constant reaching and frequent or constant near acuity. Thus, again, the job descriptions provided by the D.O.T. are inconsistent with the VE's testimony. Under the D.O.T.'s description, the jobs would clearly be beyond Plaintiff's capabilities as determined by the ALJ.

In light of the evident inconsistencies between the VE's testimony and the D.O.T.'s job classifications, Plaintiff argues that the ALJ had an "affirmative responsibility" to ask about the existence of any possible conflict between the VE's testimony and the D.O.T. and, in the presence of such a conflict, to obtain from the VE a "reasonable explanation for the apparent conflict." (Doc. No. 15, at 9 (quoting SSR 00-4p).) In this case the ALJ did not ask about any possible conflict nor obtain a reasonable explanation for the apparent significant conflicts identified above. For that reason, Plaintiff asserts that remand is required.

In response, the Defendant does not deny the existence of the apparent conflict. Rather, he points out that the D.O.T. lists "maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." (Doc. No. 20, at 17.) The Defendant then basically asks the Court to presume that the VE was aware of the D.O.T. classifications but, in the numbers of jobs she represented as available, she only counted those that required sedentary

---

[7] The jobs of shipping clerk (D.O.T. 222.687-030) and receiving clerk (D.O.T. 222.687-018) are classified as light and medium work, respectively.

work and no more than occasional reaching.  In the alternative, Defendant asserts that the ALJ only has an affirmative inquiry about "possible" conflicts, and that this responsibility was never triggered because the VE's testimony "presented no conflict that the ALJ could have reasonable been aware of."  (Doc. No. 20, at 18.)

The Defendant's argument are patently disingenuous.  First, pursuant to 20 C.F.R. §§ 404. 1566(d)(1) and 416.966(d)(1), the agency has taken administrative notice of the D.O.T., thereby obviating the Commissioner's argument that the ALJ had no reason to be aware of the existence of a conflict between the VE's testimony and the D.O.T.  Moreover, while the ALJ obviously cannot be required to memorize the D.O.T., the insurmountable fact remains that the ALJ has an affirmative obligation to inquire regarding the existence of possible conflicts and, in the presence of apparent conflicts, to ask the VE to provide a reasonable explanation for them.  *Cf. Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 652 (E.D. Mich. 2004) (remanding for further fact-finding where there was an apparent conflict between a VE's testimony and the D.O.T. but the ALJ made "no attempt to comply with SSR 00-4p" by eliciting an explanation for the conflict before relying on the VE's evidence); *Teverbaugh v. Comm'r of Soc. Sec.*, 258 F. Supp. 2d 702, 705–06 (E.D. Mich. 2003) (citing SSR 00-4p, finding that the ALJ failed to carry his burden at step five where the ALJ failed to ask the VE whether the jobs she identified as consistent with the Plaintiff's RFC conflicted with the D.O.T., and the VE failed to provide the codes for the positions she listed, thereby prevent Plaintiff from ascertaining whether there was a conflict).

In the present case, the ALJ did not inquire about the existence of possible conflicts and did not elicit any testimony from the VE explaining the evident conflicts.  As a result of the inconsistencies between the VE's testimony and the job descriptions contained in the D.O.T., the Commissioner did not meet his burden at the fifth step of the evaluation process of showing the existence of a significant number of jobs in the national economy that Plaintiff is capable of performing given her age, experience, education, and residual functional capacity.

Sentence four of § 405(g) provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §§ 405(g), 1383(c)(3).  "In cases where there is an adequate record, the Secretary's decision denying

benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). A court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994). In this case, remand for further fact-finding is required so that the Commissioner can properly apply SSR 00-4p.

**V.      CONCLUSION**

For the reasons discussed above, Plaintiff's motion to remand will be granted. An appropriate Order will enter.


Thomas A. Wiseman, Jr.
Senior U.S. District Judge